**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>THE BON MORRO, LLC**,** *et al.¹*<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-12379<br>(Joint Administration Requested) |

### DECLARATION OF STEPHEN GRAY IN SUPPORT OF FIRST DAY MOTIONS

I, Stephen Gray hereby declare as follows,

1.      Since October 15, 2025, I have been the Chief Restructuring Officer of The Bon Morro, LLC ("Leasehold Owner"), The Bon Morro Holdings, LLC ("Holdings") and DMP Scape Boylston LLC ("DMP Scape" and, together with Leasehold Owner and Holdings, the "Debtors" and each separately a "Debtor").

2.      I have over forty (40) years of experience developing and implementing restructuring and crisis management plans for public and private companies, creditors, and judicial bodies. I was the founder and CEO of The Recovery Group, Inc. (TRG) from 1981-2007. In 2007, TRG merged with Corporate Revitalization Partners (CRP) to form CRG Partners (CRG), where I served as Senior Managing Partner. After CRG was acquired by Deloitte in 2012 I was the leader of Deloitte's Fiduciary Services Practice. In 2014, I resigned from Deloitte to form Gray & Company LLC, a practice specializing in providing restructuring and fiduciary services to clients and courts.

3.      I have led the successful operational and financial restructuring of hundreds of

---

¹       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number are: The Bon Morro, LLC (4030), The Bon Morro Holdings, LLC (5935), and DMP Scape Boylston LLC (4401).

companies, serving as CEO, CRO, trustee, receiver, restructuring advisor and independent director. I have also served as chapter 11 trustee in twenty-seven (27) cases, post-confirmation trustee in twenty-three (23) cases, state or federal court receiver in sixteen (16) cases, examiner in bankruptcy in eight (8) cases, and as a chapter 7 trustee in hundreds of cases.

4.　　　I am knowledgeable and familiar with the Debtors' business and financial affairs. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by agents of the Debtors working under my supervision, or my opinion based upon experience, knowledge, and information concerning the Debtors.

5.　　　This Declaration is submitted to apprise the Court and other parties in interest of the circumstances that compelled the commencement of the Debtors' cases under the Bankruptcy Code (these "Chapter 11 Cases"). I am authorized to submit this Declaration as an authorized signatory and representative of the Debtors.

6.　　　The facts asserted in this Declaration are to the best of my knowledge at this time. If called upon to testify, I will testify competently to the facts set forth in this Declaration.

## I.　　Debtors' Business and Pre-Petition Capital Structure.

7.　　　Leasehold Owner is a Delaware limited liability company with Holdings as its sole member. Leasehold Owner's sole asset consists of a ground lease interest in a mixed-use real estate project commonly known as The Bon, located at 1260 Boylston Street in Boston, Massachusetts (the "Project"), and consisting of 451 studio, one-bedroom and two-bedroom residential apartment units and seven commercial units. Construction of the Project was completed in 2022.

8.　　　Holdings is a Delaware limited liability company. Holding's sole asset consists of its 100% membership interest in Leasehold Owner.

9.　　　DMP Scape is a Massachusetts limited liability company. DMP Scape's sole asset

consists of its 83.195% membership interest in Holdings.

10.     Approximately 95% of the residential apartment units at the Project are currently leased and the rents paid by the residential tenants aggregate to approximately $17 million annually. Of the leased units, 15% constitute subsidized affordable housing, though the remaining leases are at market rates.

11.     The current majority owner of the Project, an individual investor, previously held a passive stake in the Project and was not involved in the negotiation of the Ground Lease, planning the Project, or the diligence process. He planned to rescue, stabilize, and deleverage the Project, which was in jeopardy due to its debts. The individual investor strongly supported the Project's goal of increasing and maintaining the availability of affordable family housing in Boston by creating highly efficient and flexible multifamily housing for young professionals and students in order to free up more family-friendly triple-decker housing for local families. Further, given the Project's high levels of occupancy and rental income, he believed the Project could be a successful business venture if the tenant reduced its debt levels by refinancing the Prepetition Mortgage Loan (as hereinafter defined) with a long-term, low-interest loan. Lenders routinely extend such loans to stabilized developments (such as the Project) after construction is complete, and the development is sufficiently occupied and generating income.

12.     Five of the seven commercial units are leased to Chase Bank, Carbon Health, Dave's Hot Chicken, The Halal Guys and The Theater Offensive. The Theatre Offensive's rent is capped at $1,000 annually. The rents paid by the commercial tenants aggregate to approximately $4.1 million annually.

13.     Given the existing terms of the Ground Lease, feedback from valuation experts and market feedback from multiple sources and the Debtors' efforts to refinance the construction debt,

- 3 -

I estimate that there is no equity value in the Project as of the Petition Date. However, if the Landlord had cooperated to amend the Ground Lease to contain commercially reasonable and market standard terms that are readily acceptable to conventional leasehold mortgage lenders, it is estimated that the Leasehold Owner's interest in the Project has a value of at least $190 million.

14.     On October 30, 2020, Leasehold Owner obtained a construction loan from the Mortgage Lender in the amount of $165 million. This construction loan was restructured on an interim basis by the current mortgage loan  (the "Prepetition Mortgage Loan") pursuant to that certain Loan Agreement dated as of November 7, 2023 (as amended by that certain First Omnibus Amendment to Loan Documents dated as of December 31, 2024, that certain Second Omnibus Amendment to Loan Documents dated as of January 17, 2025 and as further amended, restated, modified or supplemented from time to time, the "Prepetition Credit Agreement"), among Leasehold Owner as borrower, 1260 Boylston Street Lender, LLC, Athene Annuity and Life Company and Aris Mortgage Lending, LLC as lenders (the foregoing, collectively, the "Prepetition Mortgage Lenders") and 1260 Boylston Street Lender LLC, as administrative agent (the "Prepetition Mortgage Agent", and together with the Prepetition Mortgage Lenders, the "Prepetition Mortgage Secured Parties"). The obligations under the Prepetition Credit Agreement are secured by, among other things, a leasehold mortgage on the Project. The Prepetition Mortgage Loan matured on July 17, 2025. As of the Petition Date, the principal amount owed, under the Prepetition Credit Agreement is $162,500,000.

15.     The debt structure also includes a subordinated loan (the "Prepetition Subordinated Loan", and together with the Prepetition Mortgage Loan, the "Prepetition Loans") from GCP Asset Backed Income (UK) Limited (the "Prepetition Subordinated Lender", and together with the Prepetition Mortgage Secured Parties, the "Prepetition Loan Parties") to non-Debtor Scape

Boylston Manager LLC ("Scape Boylston Manager") pursuant to that certain Mezzanine Loan Agreement dated as of December 23, 2020 (the "Original Subordinated Loan Agreement"). On January 17, 2025, the Original Subordinated Loan Agreement was modified pursuant to that certain Tri-Party Framework Agreement among DMP Scape, Scape Boylston Manager LLC and Prepetition Subordinated Lender (the "Subordinated Loan Modification Agreement"), whereby DMP Scape replaced Scape Boylston Manager as the Borrower under the Prepetition Subordinated Loan. Additionally, all outstanding obligations under the Original Subordinated Loan Agreement were replaced with (i) a $5,000,000 obligation due on the effective date thereof, which was paid in full, and (ii) a second $5,000,000 obligation, which matured on July 15, 2025, and which remains outstanding.

16.     In addition to funded debt, the Debtors' obligations include a 99-year ground lease dated as of July 15, 2018 (as amended by that First Amendment of Lease dated October 30, 2020, that Second Amendment of Lease dated October 20, 2023, the "Ground Lease") between Leasehold Owner as tenant and Boylston Kenmore 1260, LLC (the "Landlord"), pursuant to which the Leasehold Owner leases the land on which the Project was constructed. Pursuant to the Ground Lease, the Leasehold Owner pays the Landlord $3,000,000 in fixed annual rent, subject to certain escalation provisions. The term of the Ground Lease expires on October 31, 2119.

17.     Because the current majority owner of the Project held a passive minority stake in the Project until early 2025, the current owner played no role in the original negotiation of the Ground Lease (whose off-market terms are highlighted below), had no relationship or meaningful interactions with the Landlord, or had reason to believe that the Landlord would pose an impediment to future refinancing efforts.

**II.**   **Events Leading Up to Chapter 11 Cases.**

18.     Although successful from an operational standpoint and almost fully-leased, the Project has significant outstanding debts that, given the challenges of the Ground Lease, have not been refinanced and thus still constitute construction loans. Following construction, the Project has generated significant cash flow from residential and commercial tenants, which was more than adequate to fund its operating expenses (not including debt service). For example, in fiscal year 2024, the Project generated $9,652,185 in net operating income, before accounting for rent payments due under the Ground Lease. However, as the Prepetition Loans approached maturity, it was clear the Debtors' cash flow was not sufficient to fund the payment in full of the Prepetition Loans in an amount exceeding $167.5 million (consisting of $162.5 in principal amount for the Prepetition Mortgage Loan and $5 million for the Prepetition Subordinated Loan) so the Debtors sought to refinance the Prepetition Loans. Accordingly, beginning in 2024, and continuing throughout 2025, in anticipation of the Prepetition Loans maturing in July 2025, the Debtors conducted a debt capital markets search process to identify a suitable leasehold mortgage financing to refinance the Prepetition Loans. To assist in this process, the Debtors engaged Walker & Dunlop, one of the premier debt brokerages in the country for commercial multifamily residential finance and advisory engagements.

19.     As the debt search process proceeded, it became clear that the market for financing the Project was not achieved because the Ground Lease for the Project contained a number of non-standard commercial terms. The off-market terms in the Ground Lease materially limited the Debtors' ability to refinance the Prepetition Loans.

20.     The Prepetition Mortgage Lenders had obtained relief from several of these onerous Ground Lease terms by executing a one-time "Ground Lessor Estoppel Certificate and

- 6 -

Amendment" dated November 7, 2023 (the "Madison Estoppel"). However, the Madison Estoppel expires when the Prepetition Mortgage Loan is repaid, which leaves the Debtors with no reasonable ability to refinance or sell its interest without the Landlord agreeing to amend the Ground Lease. Upon information and belief, the Prepetition Mortgage Lenders would not have provided the Prepetition Mortgage Loan without the Madison Estoppel, but the Madison Estoppel is entirely inadequate in the longer term. In general, prospective lenders, including Freddie Mac, life insurance companies, pension funds, and various debt funds have voiced concerns similar to those that Madison attempted to address two years earlier via the Madison Estoppel.

21.    The task of refinancing the Prepetition Mortgage Lenders was rendered more difficult by the Landlord's requirement that any refinancing lender be an "Institutional Lender", which in today's dollars, means approximately $306 million in gross assets. This requirement meant the Debtors could only look to obtain loans from more conservative lenders with tighter borrowing requirements.

22.    In March 2025, the Debtors identified Freddie Mac as one of its preferred refinancing partners, submitted a loan application, and began the diligence process. I understand that Freddie Mac is the market leader in multi-family residential real estate finance. Also, each year, Freddie Mac and its sister entity, the Federal National Mortgage Association ("Fannie Mae"), originate approximately 50% of newly issued loans for multi-family properties in the United States. Through communications with Walker & Dunlop, Freddie Mac's agents, and other prospective refinancing partners, the Leasehold Owner concluded that it could not refinance the Prepetition Mortgage Loan without amending the Ground Lease.

23.    The fix for this dilemma was straightforward. The Debtors and the Landlord simply had to modify the Ground Lease to bring the document's non-standard terms in line with the terms

typically found in other commercial real estate ground leases, changes that would have not materially impacted the Landlord's ability or likelihood to receive its ground rent. In fact, this fix was contemplated by the Ground Lease itself. Article 6.6 of the Ground Lease specifically provides that the Landlord "shall cooperate" with all requests by Leasehold Owner and a permitted lender for ground lease amendments, further requiring that the Landlord "reasonably promptly . . . negotiate and then execute . . ." an amendment to the Ground Lease "effecting such modification(s)."

24.     With this language in mind, in March and April 2025, the Leasehold Owner approached the Landlord to consensually amend the Ground Lease to facilitate a refinancing of the Prepetition Loans. Executing such an amendment would benefit the Landlord by reducing the risk that the Leasehold Owner would default on its debts or on its obligations under the Ground Lease. Based on the feedback that the Leasehold Owner received from the debt market, an adequate Ground Lease amendment in place, the Project could be an attractive asset for an insurance company or real estate investment fund to finance or own. In the long term, those risk-averse institutional investors could be very stable tenants for the Landlord.

25.     Despite the Ground Lease's cooperation requirement, I understand that the Landlord refused to approve the Leasehold Owner's reasonable requests for an amendment to the Ground Lease by consistently engaging in conduct that has prevented a commercial resolution to the Debtor's ability to refinance the Project. Additionally, the Landlord engaged in bad-faith extortionary tactics, such as demanding (i) an upfront $1.5 million payment and (ii) an increased security deposit equal to three years' rent (despite the fact that security deposits for similar ground leases typically require, at most, one year of rent without adjusting for rent increases) as prerequisites for any negotiation.

26.    Substantially concurrently with the filing of the petitions initiating these Chapter 11 Cases, the Debtors are filing an adversary complaint against the Landlord to pursue various claims against the Landlord under the Ground Lease and applicable state law (the "Landlord Complaint"). The Landlord Complaint will further elaborate on the bad faith conduct of the Landlord over the past seven months that drove this financially healthy Project into bankruptcy.

27.    The Debtors repeatedly warned the Landlord that failure to amend the Ground Lease would prevent any ability to refinance the Prepetition Loans, harm the Ground Lease itself, and also result in defaults thereunder and the likely need to file for bankruptcy. Despite these warnings, I understand that the Landlord continued to refuse to cooperate in amending the Ground Lease to permit a refinancing. This state of affairs persisted for weeks and caused the Leasehold Owner to miss opportunities to refinance and/or sell the Project during the Spring of 2025. Thereafter, DMP Scape predictably defaulted on the Prepetition Subordinated Loan when it matured on July 15, 2025, and Leasehold Owner defaulted on the Prepetition Mortgage Loan when it matured two days later (the foregoing defaults, collectively, the "Maturity Defaults").

28.    In the leadup to and aftermath of the Maturity Defaults, the Debtors concurrently engaged with the Prepetition Mortgage Agent and the Prepetition Subordinated Lender to address the maturity defaults or amend the Prepetition Loans to allow more time for the Debtors to reach a resolution with the Landlord or otherwise refinance the Prepetition Loans. In the following months, the Debtors diligently pursued a consensual out-of-court deal with the Prepetition Mortgage Agent, the Prepetition Subordinated Lender and the Landlord, but the parties were unable to reach an agreement.

29.    Debtors' counsel specifically warned the Landlord that the Leasehold Owner likely would file for bankruptcy if the Leasehold Owner was unable to refinance the Prepetition Loans.

30.     Despite the Debtors' efforts, on October 13, 2025, the Prepetition Subordinated Lender noticed a secured party sale of its collateral (DMP Scape's membership interests in Holdings) under Article 9 of the Uniform Commercial Code. Because the sale of the Prepetition Subordinated Lender's collateral was scheduled to commence on November 6, 2025, the Debtors had no choice but to seek chapter 11 protection.

31.     In summary, the Debtors have been forced to seek chapter 11 protection due to their inability to amend the Ground Lease and the Prepetition Loan Parties' pending enforcement action.

## III.     The Chapter 11 Cases.

32.     On November 2, 2025 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases with this Court. The Debtors intend to operate their businesses and to manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. The Leasehold Owner's Chapter 11 Case has been filed as a "single-asset real estate" case (as defined in Section 101(51B) of the Bankruptcy Code), subject to all relevant provisions of the Bankruptcy Code.

33.     The main goal of these Chapter 11 Cases, subject to ongoing negotiations with the Prepetition Loan Parties and the Landlord, is to pursue litigation against the Landlord via an adversary proceeding while concurrently working towards the confirmation of a chapter 11 plan and the ultimate refinancing of the Prepetition Loans or a sale of the Debtor's leasehold interests. Proceeds from any judgment obtained against the Landlord pursuant to the adversary proceeding can then be distributed for the benefit of all creditors and equity holders, consistent with the Bankruptcy Code and applicable law.

**IV.**    **First Day Relief**

34.    Contemporaneously herewith, the Debtors have filed certain "first day motions" (the "First Day Motions") seeking various relief to stabilize the Debtors' business operations during these Chapter 11 Cases and allow for the Project to continue to operate in the ordinary course without disruption. The relief requested in the First Day Motions is necessary, in the best interest of the Debtors' estates, and will allow the Debtors to pursue a value-maximizing path for the benefit of all creditors during these Chapter 11 Cases.

35.    Based on my review and understanding of the Debtor's business, the Debtors have limited the First Day Motions, and their requests for emergency rulings under MLBR 9019-1(f), to only those motions where the failure to receive such relief on an emergency basis would cause immediate and irreparable harm to the estates.

36.    Factual information in support of the First Day Motions is provided below and in each of the First Day Motions. For a more detailed description of the First Day Motions than set forth below, I respectfully refer the Court to the respective First Day Motions. I have reviewed each of the First Day Motions and believe that the factual support set forth herein and in each of the First Day Motions is correct and accurate to the best of my knowledge, information, and belief.

   **a.    Debtors' Motion For Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion").**

37.    Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their Chapter 11 Cases for procedural purposes only and granting certain related relief. Given the integrated nature of the Debtors' operations, the joint administration of these Chapter 11 Cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any creditor or party in

interest. Joint administration will also allow parties in interest to monitor these cases with greater ease and efficiency.

38.    Because most of the motions, hearings, and orders in these cases will affect each Debtor, the entry of an order directing joint administration of these cases will undoubtedly reduce costs by avoiding duplicative filings that would be required absent such relief, as well as ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of three separate cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**b.    Debtors' Motion for Entry of an Order (I) Authorizing Consolidated Creditors Lists, and (II) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases and Other Information (the "Creditor Matrix Motion")**

39.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated creditor matrix in lieu of submitting separate mailing matrices and creditor lists for each Debtor; and approving the form and manner of notice of commencement of these Chapter 11 Cases. Given the integrated nature of the Debtors' operations, providing one global creditor matrix for purposes of notice in these Chapter 11 Cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any creditor or party in interest.

**c.    Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To Prepetition Mortgage Secured Parties, (III) Granting Replacement Liens, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing And (VI) Granting Related Relief (the "Cash Collateral Motion").**

40.    Pursuant to the Cash Collateral Motion, the Debtors seek Court authorization to use their cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") in accordance with a budget as set attached to the Cash Collateral Motion.

41.    The Prepetition Mortgage Agent, on behalf of the Prepetition Mortgage Secured Parties, is the only party with a lien on the Debtors' cash to allow for the continued operation of the Project as a going concern and the payment of all fees and expenses in connection with the Chapter 11 Cases. Prior to the Petition Date, the Debtors engaged in numerous discussions with the Prepetition Mortgage Agent in an attempt to obtain an agreement on consensual use of cash collateral but were unable to reach an agreement prior to the Petition Date. The Debtors nonetheless intend to continue to attempt to engage with the Prepetition Mortgage Agent going forward to try and narrow the remaining disputes between the parties.

42.    The Debtors require immediate access to Cash Collateral to maintain and cover ordinary course operating expenses of the Project to fund the administrative expenses of the Chapter 11 Cases.

43.    Without the ability to use Cash Collateral to pay ordinary course maintenance, utilities and related services in the Project, the Debtors' commercial and residential tenants would face immediate, irreparable harm. Without a prompt grant of authority to use Cash Collateral, the Debtors will be unable to pay the expenses required to maintain the property that serves as collateral for the Prepetition Mortgage Agent and provides value to the Debtors' stakeholders. An inability to satisfy such obligations would significantly hinder the Debtors' operations and cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all creditors and other stakeholders.

44.    Immediate access to Cash Collateral for the limited purposes requested in the Cash Collateral Motion will maintain the status quo, preserve the value of the Project and, thereby, preserve the value of the Debtors' estates and permit the Debtors to continue to operate as a going concern during the period between entry of the proposed interim order and entry of the final order.

Accordingly, the use of Cash Collateral is essential to the Debtors' ability to minimize disruptions and maximize value for their estates, creditors and other parties-in-interest.

45.     With the use of Cash Collateral during the initial portion of these Chapter 11 Cases, the Debtors will maintain sufficient cash to continue operations in the ordinary course during these Chapter 11 Cases, including the funding of amounts anticipated under the various first day motions.  There are no projected incremental funding needs required during the interim period.

46.     Access to Cash Collateral will provide a clear and strong message to the Debtors' vendors and other contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally; in particular, the continued maintenance and operation of the Project. There exists a risk of irreparable harm in the near term if the Debtors are denied access to Cash Collateral, as access to Cash Collateral is essential to preserve and maximize the value of their estates, and administer these Chapter 11 Cases.

47.     If the Debtors are denied access to Cash Collateral, they will face immediate and irreparable harm, as immediate access to Cash Collateral will provide the Debtors with sufficient funds to make payments pursuant to the First Day Motions, preserve and maximize the value of the Project and the Debtors' estates, and administer these Chapter 11 Cases.

48.     The Debtors' need to use Cash Collateral is immediate. The Debtors' business relies on the ability to use cash generated by the Project to manage their day-to-day operations in the ordinary course. Absent the immediate funding permitted by the Cash Collateral Motion, the Project would falter and the value of the Debtors' assets would diminish. For these reasons, and the reasons stated in the Cash Collateral Motion, the Debtors submit that their continued use of Cash Collateral, on the terms set forth in the Cash Collateral Motion, is in the best interests of the estates and should be approved.

**d. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Their Cash Management System and Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms And (II) Granting Related Relief (the "Cash Management Motion").**

49.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue operating their prepetition cash management system, as further described below (the "Cash Management System"), (ii) maintain their existing bank accounts (together with any accounts opened after the date hereof, the "Bank Accounts" and each, a "Bank Account") located at certain banks and financial institutions (each, a "Bank" and, collectively, the "Banks"), with the ability to open and close Bank Accounts post-petition in the ordinary course of business, and (iii) maintain their existing Business Forms (as defined in the Cash Management Motion), and (b) authorizing the applicable financial institutions to treat, service, and administer the Bank Accounts in the ordinary course of business and to receive, process, honor, and pay all checks or wire transfers used by the Debtors.

50.    In the ordinary course of business, the Debtors utilize an integrated and centralized Cash Management System, consisting of depository, operating, and other accounts, allowing the Debtors to efficiently collect and concentrate cash receipts from the Project.

51.    The Cash Management System is specifically tailored to the Debtors' operational needs and enables the Debtors to, among other things, accurately forecast and report their cash flow requirements and monitor the collection and disbursement of funds to and from the Bank Accounts. The Cash Management System is essential to the efficient operation of the Debtors' business in the ordinary course and any disruption to the Cash Management System is likely to materially impair the Debtors' ability to continue operations of the Project.

52.     The Debtors' Cash Management System is comprised of three Bank Accounts: (i) the Deposit Account; (ii) the Rent Account; and (iii) the Operating Account. The Deposit Account and Rent Account collect security deposits and rents, respectively, from the Debtors' tenants. The Operating Account, in turn, collects excess rents from the Rent Account and any security deposits that are being returned to tenants from the Deposit Account. The Operating Account is the primary disbursement account for the Debtors and funds operational expenses.

53.     In the Cash Management Motion, the Debtors seek authorization to continue to operate their Cash Management System, as well as honor any prepetition obligations related thereto (including bank fees) in the ordinary course of business, and maintain existing Business Forms.

54.     Based on my understanding of the Debtors' business and the Project, I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid significant interruptions to the Debtors' businesses and operation of the Project.

55.     I believe that authorizing the Debtors to continue operating their Cash Management System as it was operated as of the Petition Date, pay bank fees, and maintain existing Business Forms is essential to the Debtors' operational stability and the success of these cases. In my opinion, this relief will facilitate the Debtors' operation of the Project in these Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system, by minimizing delays in the payment of postpetition obligations, thereby ensuring the efficient administration of these Chapter 11 Cases, and by maximizing the value of the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**e. Debtors' Motion For Entry Of Interim and Final Orders (A) Prohibiting Utilities From Altering, Refusing Or Discontinuing Services, (B) Determining Adequate Assurance Of Payment For Future Utility Services And (C) Establishing Procedures For Determining Requests For Adequate Assurance Of Payment (the "Utilities Motion").**

56.     The Debtors seek entry of interim and final orders authorizing the Debtors to ensure continued provision of utility services at the Debtors' Project, the Debtors seek entry of an order (a) prohibiting the utility providers from altering, refusing, or discontinuing any utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (b) determining that the Debtors' proposed offer of deposits, as set forth in the Utilities Motion, provides the utility providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and (c) approving procedures for resolving requests by utility providers for additional or different assurances beyond those set forth in the Utilities Motion.

57.     Based upon cash flow from operations of the Project and use of Cash Collateral, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to their utility providers. The utility providers are summarized as follows:

| Utility Provider | Utility | Provider Address | Approximate Monthly Bill |
|---|---|---|---|
| Boston Water and Sewer | Water and Sewer | P.O Box 55466 Boston, MA 02205 | $15,000 |
| Eversource | Electricity | P.O Box 56007 Boston MA 02205 | $40,000 |
| BP | Electricity/Energy | 540 W Madison, 4th Floor Chicago, IL 60661 | $2,500 |
| National Grid | Gas | P.O Box 1040 Northborough MA 01532 | $6,200 |
| Crown Castle | Internet | P.O 28730 New York NY 10087 | $5,000 |

| New Horizon Communications | Fire Life Safety and Network Monitoring Services | 200 Baker Ave suite 300 Concord MA, 01742 | $800 |
|---|---|---|---|

58.     The Debtors propose to fund a segregated account with a deposit equal to $35,000, approximately one half of the Debtors' estimated aggregate utility expenses, as adequate assurance of future payment required under the Bankruptcy Code and, additionally, have proposed standard procedures to address any request made by the utility providers for additional adequate assurance as more fully described in the Utilities Motion.

59.     Any disruption of the Debtors' utility services would cause irreparable harm to the Project, the Debtors' business operations, their estates, and their ability to maximize value through these Chapter 11 Cases. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

**f.   Debtors' Motion For Entry Of Interim and Final Orders (I) Authorizing The Payment Of Certain Prepetition Taxes And Fees And (II) Granting Related Relief (the "Taxes Motion").**

60.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, the Taxes and Fees (as defined in the Taxes Motion), whether asserted prior to, on, or after the Petition Date (b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay the foregoing.

61.     The Debtors pay property taxes to the City of Boston on a quarterly basis. As of the Petition Date the Debtors owed approximately $533,170.98 on account of Taxes and Fees, specifically second quarter property taxes owed to the City of Boston. The Debtors are unaware of

any other Taxes and Fees owed but seek the balance of relief in the Taxes Motion out of an abundance of caution. In the Taxes Motion the Debtors seek authority to pay: (a) Taxes and Fees that accrue or are incurred postpetition; (b) prepetition Taxes and Fees in the approximate amount of $533,170.98; and (c) in accordance with the procedures set forth herein, prepetition Taxes and Fees that have not been identified and disclosed in the Taxes Motion.

62.     The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations. Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if taxes and fees are not timely paid. Similarly, tax authorities may attempt to suspend the Debtors' operations, or even seek to lift the automatic stay. Moreover, I understand that certain taxes and fees may give rise to tax liens and some or all may be entitled to priority, which would therefore require that these amounts be paid in full. Because the Debtors' failure to pay Taxes and Fees would likely erode the Debtors' reputation, impair the value of the Debtors' estates, including the Project, and negatively affect the Chapter 11 Cases, I submit that the proposed relief is in the best interest of the Debtors' estates and should be granted.

**g. Debtors' Motion For Entry Of Interim and Final Orders (I) Authorizing The Debtors To (A) Maintain Existing Insurance Coverage, (B) Satisfy All Prepetition Obligations Related To Insurance Coverage In The Ordinary Course Of Business, And (C) Renew, Supplement, Or Enter Into New Insurance Coverage In The Ordinary Course Of Business, And (II) Granting Related Relief (the "Insurance Motion").**

63.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to maintain, continue, review, purchase, renew or extend, and obtain, in their sole discretion, their various liability, property, casualty, and other insurance programs in the ordinary course of their business (collectively, the "Insurance Programs") through numerous private insurance carriers on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date and

- 19 -

(b) authorizing the applicable financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to fund the foregoing.

64.    The Debtors' existing Insurance Programs are essential to preserve the value of the Project, the Debtors' business, properties, and assets. A detailed list of the Insurance Policies and Insurance Carriers is as follows:

| Insurance Carrier | Address | Debtor Entity | Insurance Type | Annual Payment |
|---|---|---|---|---|
| ACE Property and Casualty Insurance Company | 1180 6th Avenue, 16th Floor, New York, NY 10036 | The Bon Morro, LLC | Umbrella | $84,929 |
| The Travelers Indemnity Company | RCS Insurance Brokerage, Inc. 160 Federal St, 4th Floor Boston, MA 02210 | The Bon Morro, LLC | Property | $179,886 |
| The Travelers Indemnity Company | RCS Insurance Brokerage, Inc. 160 Federal St, 4th Floor Boston, MA 02210 | The Bon Morro, LLC | General Liability | $74,426 |
| The Travelers Indemnity Company | RCS Insurance Brokerage, Inc. 160 Federal St, 4th Floor Boston, MA 02210 | The Bon Morro, LLC | Employee Benefits Liability | $300 |
| The Travelers Indemnity Company | RCS Insurance Brokerage, Inc. 160 Federal St, 4th Floor | The Bon Morro, LLC | Auto | $400 |

| | Boston, MA 02210 | | | |
|---|---|---|---|---|

65.    The aggregate annual premium for the Insurance Policies is approximately $339,941, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions. As of the Petition Date, the Debtors are current on all amounts due under the annual premiums.

66.    I understand that, in many cases, the insurance coverage provided by the existing Insurance Programs is required by diverse regulations, laws, and contracts. Failure to make the payments required to maintain the Debtors' insurance policies could have a significant negative impact on the Debtors' operations. Absent sufficient and continuing insurance coverage, the Debtors may also be exposed to substantial liability and may be unable to continue to operate the Project.

67.    Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Dated: November 3, 2025

/s/ Stephen Gray
Name: Stephen Gray
Title: Chief Restructuring Officer